Filed 4/8/13  P. v. Fructuosco CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE, | B239199 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA355534) |
| v. | |
| JOSE FRUCTUOSO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis Landin, Judge.  Affirmed.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

Jose Fructuoso appeals from his conviction by jury verdict of second degree murder. He contends the trial court erred in requiring his testimony as a foundation for expert psychiatric testimony that he suffered from post traumatic stress disorder. He claims the prosecutor committed numerous incidents of prejudicial misconduct. Appellant argues that the trial court erred in admitting DNA testimony in violation of his right to confrontation guaranteed by the Sixth Amendment to the United States Constitution. He asserts that the admission of a statement he made to a transporting police officer without readvisement of his *Miranda*[1] rights was error. He contends the trial court's response to a jury question about the difference between first and second degree murder was inadequate. Finally, appellant challenges the sufficiency of the evidence of second degree murder, arguing that it instead supports a verdict of voluntary manslaughter committed in the heat of passion.

We find no basis for reversal. The order that appellant lay a foundation for expert testimony about post traumatic stress disorder was not error. We find no reversible prosecutorial error. The admission of an expert witness's testimony regarding DNA testing did not violate the right to confrontation because the raw data on which she based her opinions was not prepared with the requisite formality to constitute testimonial statements. Appellant's statement to the officer who transported him for booking was sufficiently contemporaneous to his original advisement of rights that no readvisement was required. The trial court adequately responded to the jury's question, and in any event, any error was harmless. We find substantial evidence to support the jury's verdict.

### FACTUAL AND PROCEDURAL SUMMARY

On the afternoon of January 1, 2010, Bennett Bradley's downstairs neighbor saw him outside, watering his garden while talking on a cordless telephone. At 5:00 p.m. the same day, the neighbor heard footsteps upstairs in Bradley's apartment and the sound of

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

someone moving furniture. When Bradley, a theatrical director, did not appear for a meeting at work on January 2, a coworker went to his apartment. Bradley was dead on the floor of the living room with his throat slashed and his pants twisted and down around his legs. The outside doors to his apartment were open. His wallet was found near his body, with the cash missing. His bedroom had been ransacked, and there was blood in the living room and bathroom. Bradley, who was openly homosexual, had a history of multiple sex partners, some of them strangers.

Telephone records established that numerous calls were made from Bradley's telephone to appellant's between December 31, 2009 and January 1, 2010, and that appellant returned the calls. Appellant lived one-half block from Bradley's apartment. A carving knife was found in appellant's living room which had blood consistent with Bradley's DNA profile on it.

Appellant was arrested. During the booking process, appellant told an officer that he had met '"the other guy"' when he was 16, and that he had sex with the other guy. Appellant was then 25 years old. He said he had encountered the victim again recently and that they had gone back to the victim's place. Appellant said the victim was having sex with him "so hard". He told the officer he had the knife with him because he was a recycler.

Appellant was charged with Bradley's murder. He was convicted of second degree murder and the jury found true an allegation that he personally used a knife in the commission of the offense (Pen. Code, § 12022, subd. (b); statutory references are to this code unless otherwise indicated.) He was sentenced to state prison for a term of 16 years to life. This timely appeal followed.

## DISCUSSION

### I

Appellant argues the trial court erred in requiring him to testify as to the factual basis for a defense expert's testimony that he suffered from post traumatic stress disorder (PTSD). He claims he was forced to waive his Fifth Amendment privilege against self

3

incrimination in order to preserve his Sixth Amendment right to present the PTSD defense.

## A. *Standard of Review*

Appellant contends that this is a question of law reviewed de novo. The cases he cites for that proposition do not support it. (*People v. Culp* (2002) 100 Cal.App.4th 1278 [issue was the calculation of good conduct and work credits, a question of law on undisputed facts]; *People v. Cromer* (2001) 24 Cal.4th 889, 896 [discussion of case law on the standard of review where there are mixed questions of law and fact]; *People v. James* (1998) 62 Cal.App.4th 244, 259–261 [question was whether a felony is inherently dangerous for purposes of the second degree felony-murder rule]; *People v. Bravo* (1990) 219 Cal.App.3d 729, 732 [sole issue on appeal was the calculation of presentence custody credits, a question of statutory interpretation subject to independent review].) The question presented by appellant is more properly framed as whether the trial court erred in ruling that appellant's testimony was required to lay an adequate foundation for the testimony of the expert witness on PTSD. We review the trial court's ruling on that question for abuse of discretion. (*People v. Moore* (2011) 51 Cal.4th 386, 406 (*Moore*).)

## B. *Procedural Context*

Before trial, the prosecutor moved to limit the examination of defense expert witness, Dr. Kaser-Boyd, and to exclude inadmissible hearsay in the guise of expert opinion. One of his arguments was that the defense could not put the defendant's statements before the jury in the guise of using them as a basis for Dr. Kaser-Boyd's opinion that he suffered from PTSD. At the outset of the discussion of that motion, the court adressed the order of the witnesses. Defense counsel said: "As an offer of proof, I'm letting the court know my client will be testifying." The court asked why defense counsel did not plan to call appellant right away since he planned to testify. Defense counsel said she was not ready to have him testify on direct because she had been preparing for the examination of Dr. Kaser-Boyd.

The court then took up the prosecution's motion to require appellant to testify first in order to lay a foundation for Dr. Kaser-Boyd's testimony about the basis for her

4

opinion that he suffered from PTSD. The court asked whether appellant would testify before Dr. Kaser-Boyd. Defense counsel said that he would not, and that he did not have to because the expert witness could testify about hearsay statements which were used to form her opinions. The prosecutor argued that this was a backdoor method of placing appellant's statements before the jury without his testimony. Defense counsel said she was confused about the prosecutor's concern because she had represented to the court that defendant would testify. The court observed that if appellant changed his mind about testifying, the prosecutor would have no way of challenging Dr. Kaser-Boyd's testimony about what appellant told her.

The trial court tentatively ruled that Dr. Kaser-Boyd could not testify unless defendant testified, citing *People v. Coleman* (1985) 38 Cal.3d 69 (*Coleman*), disapproved on another ground in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32, and *People v. Carpenter* (1997) 15 Cal.4th 312 (*Carpenter*), superseded by statute on another ground as stated in *People v. Friend* (2009) 47 Cal.4th 1, 87. It took a recess to read *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*) which was cited by defense counsel. In *Gardeley*, a law enforcement gang expert was allowed to testify that a crime was committed for the benefit of a criminal street gang based on hearsay evidence. (*Id*. at pp. 618–620.) Defense counsel argued that the court's ruling would force appellant to choose between invoking his Fifth Amendment privilege not to testify or having Dr. Kaser-Boyd prevented from testifying about the basis for her PTSD opinion. The court relied on the rule that it had the discretion to weigh the probative value of the inadmissible evidence relied upon by an expert witness against the risk that the jury might improperly consider it as independent proof of those facts, citing *Gardeley*. (*Id*. at p. 619.) The court ruled that unless appellant testified about his history of sexual abuse, Dr. Kaser-Boyd could not testify about his statements which were a basis for her opinion that he suffered from PTSD. Appellant testified before Dr. Kaser-Boyd.

*C. Contentions*

Appellant claims the court's ruling required that he waive his Fifth Amendment privilege against self-incrimination in order to preserve his Sixth Amendment right to

5

present a defense. He contends that evidence of PTSD is routinely admitted in California and elsewhere through expert testimony, citing two cases on battered woman syndrome. He also cites *People v. Lucero* (2000) 23 Cal.4th 692. In the passage cited, the court summarized testimony by the defendant's expert that defendant suffered from posttraumatic stress disorder caused by war experiences while serving three tours of duty in Vietnam. (*Id*. at pp. 712–713.) But the court did not address whether a sufficient foundation for this testimony was presented. Several witnesses from the defendant's unit testified about combat situations and casualties suffered by the unit, although they did not remember defendant individually. In addition, family members testified about the defendant's difficult and impoverished childhood. (*Id*. at pp. 711–712.) This testimony laid an independent foundation for the expert witness's opinion that defendant suffered from PTSD, making it unnecessary to discuss whether the testimony of the defendant himself was required to lay the foundation. Cases are not authority for propositions not considered. (*People v. Wilder* (1995) 35 Cal.App.4th 489, 498–499.)

Appellant asserts that the prosecution could have challenged his underlying hearsay statements by cross-examining Dr. Kaser-Boyd. Respondent argues that the trial court did not abuse its discretion in following *Coleman* and *Carpenter* out of concern that defendant could change his mind and decline to testify, leaving incompetent hearsay before the jury. Alternatively, it contends any error was harmless under either *People v. Watson* (1956) 46 Cal.2d 818 or *Chapman v. California* (1967) 386 U.S. 18. Respondent argues that appellant planned to testify for two purposes independent of the PTSD defense. The first was to lay the foundation for testimony of Yolanda Castillo about a statement made by appellant four years before that he had been raped by a Black man who worked at a theater. Respondent also contends that appellant's testimony was necessary to establish that he was drunk when he went to the victim's apartment, as a basis for a jury instruction on voluntary intoxication. Alternatively, respondent argues that appellant's testimony regarding his history of sexual abuse in general, and by the victim, "ultimately strengthened Dr. Kaser-Boyd's conclusions."

*D. Analysis*

"When the relevance of proffered evidence depends on the existence of a preliminary fact, the proponent of the evidence has the burden of producing evidence as to the existence of that preliminary fact. (Evid. Code, § 403, subd. (a)(1).) The proffered evidence is inadmissible unless the trial court finds sufficient evidence to sustain a finding of the existence of the preliminary fact. (*Ibid.*; see also *People v. Marshall* (1996) 13 Cal.4th 799, 832 ['the trial court must determine whether the evidence is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence'].) 'The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion.' [Citations.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1102–1103.)

These principles apply to the opinions offered by an expert witness. "'[T]he value of an expert's opinion depends on the truth of the facts assumed.' [Citation.] 'Where the basis of the opinion is unreliable hearsay, the courts will reject it.' [Citations.] It is settled that a trial court has wide discretion to exclude expert testimony, including hearsay testimony, that is unreliable. [Citations.]" (*People v. McWhorter* (2009) 47 Cal.4th 318, 362 (*McWhorter*).) It is established that an expert witness's opinion "'may not be based "*on assumptions of fact without evidentiary support* [citation], *or on speculative or conjectural factors* . . . . [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?" [Citation.]' (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.)" (*Moore*, *supra*, 51 Cal.4th at p. 405.)

The rule of Evidence Code section 801 is that "[a]n expert may rely on otherwise inadmissible hearsay evidence provided the evidence is reliable and of the type that experts in the field reasonably rely upon in forming their opinions. [Citations.] *On the other hand*, *an expert's reliance on hearsay does not automatically make the hearsay evidence itself admissible.* 'An expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably . . . be

7

relied upon" for that purpose. [Citations.] On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. However, *prejudice may arise if, "'under the guise of reasons,'" the expert's detailed explanation "'[brings] before the jury incompetent hearsay evidence*. [Citation.]'" [¶] Because an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment. [Citations.] . . . [¶] . . . In such cases, Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. [Citation.]' (*People v. Montiel* (1993) 5 Cal.4th 877, 918–919.)" (*People v. Yuksel* (2012) 207 Cal.App.4th 850, 856–857 (*Yuksel*), italics added.)

In *Yuksel*, *supra*, 207 Cal.App.4th 850, the defendant was convicted of arranging to meet with a minor for sexual purposes. (§ 288.4, subd. (b).) A defense psychologist specializing in sexual offenses testified that he saw no evidence that the defendant was a pedophile, based on interviews with the defendant, psychological tests, and a review of the police file. When defense counsel asked the psychologist to explain the reasons for his opinions, the expert said that an important consideration was that this was a single incident. The expert began to say "He has no prior" when the prosecutor interrupted with an objection. The court sustained the objection to that and other questions by which defense counsel attempted to solicit the psychologist's opinion that the defendant had never before sought sex with a minor. On appeal, the defendant argued that this was error because evidence of no prior sexual misconduct was relevant to prove that he lacked a propensity to commit a sexual offense. (*Id*. at p. 856.)

The argument was rejected. The court observed that the defense psychologist was permitted to testify why he believed the defendant was not a pedophile, in that pedophilia was a persistent and abnormal sexual interest in children. The psychologist said a single incident of sexual contact with a minor does not qualify as pedophilia. The court concluded that the objections to appellant's hearsay statements to the psychologist that

the charged incident was isolated were properly sustained. No abuse of discretion was found. (*Yuksel*, *supra*, 207 Cal.App.4th at p. 857.) Implicit in the *Yuksel* opinion is that the defendant could have testified that he had had no prior sexual contact with a minor to lay a foundation for the expert to testify that this statement was a basis for his opinion that the defendant was not a pedophile. Absent that foundational testimony, the psychologist could not testify about the defendant's statements. As in *Yuksel*, we find no abuse of discretion in the ruling that Dr. Kaser-Boyd could not testify regarding appellant's statements about prior sexual abuse in light of the risk that the jury would consider these hearsay statements for the truth of the matter stated.

Appellant contends the prosecutor's reliance on *Carpenter*, *supra*, 15 Cal.4th at p. 403 was misplaced. He argues that *Carpenter* "did not confer authority on a trial court to require a defendant to testify as a prerequisite for admitting the testimony of his expert witness." Instead, he asserts that *Carpenter* held that a trial court should allow the defense a reasonable opportunity to present expert testimony. The passage in *Carpenter* quoted by appellant was a conclusion that the trial court had allowed the defense a reasonable opportunity to present expert testimony, "while maintaining control over the presentation of unreliable or prejudicial and sometimes cumulative hearsay." (*Id.* at p. 403.) The Supreme Court reiterated the established rule that while an expert may explain the basis for his or her opinions, "'prejudice may arise if, "'under the guise of reasons,'" the expert's detailed explanation "'[brings] before the jury incompetent hearsay evidence.'" [Citations.]'" (*Ibid.*) The *Carpenter* court went on to hold that under Evidence Code section 352, the trial court may "'exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. [Citation.]' The discretion to exclude hearsay applies to defense, as well as prosecution expert evidence. [Citation.]" (*Ibid.*)

Appellant also challenges the prosecutor's reliance on *Coleman*, *supra*, 38 Cal.3d 69. In *Coleman*, the defendant was convicted of murdering his wife, son and a niece. He testified that he had not thought of killing his family before he shot them to death, but the prosecution had three letters written by his wife 18 months before the killings in which

9

she said that the defendant had threatened to kill her many times. The principal issue in *Coleman* was the potential for prejudice from the victim wife's statement about past conduct by the accused. (*Id*. at p. 83.) The Supreme Court acknowledged the general rule that an expert "may not under the guise of reasons bring before the jury incompetent hearsay evidence." (*Id*. at p. 92.) It emphasized that in some situations, where hearsay evidence is recited in detail, a limiting instruction may not cure the prejudice. (*Ibid*.)

Appellant contends Dr. Kaser-Boyd explained that she found appellant's statements to be reliable because there was objective corroborating evidence. This included evidence that he ran away as a child, developed a serious substance abuse problem, had frequent nightmares, recurring thoughts about childhood sexual abuse, and feelings of worthlessness. He was diagnosed in jail with a major depressive order, described by Dr. Kaser-Boyd as a manifestation of PTSD. Appellant cites Dr. Kaser-Boyd's testimony at page 3403 of the reporter's transcript that appellant had many signs of being molested as a child, including running away. But she did not testify to the source of the information that appellant had a history of running away independent of appellant's statements to her about his childhood experiences and adult symptoms. Appellant also cites the next page of Dr. Kaser-Boyd's testimony, that appellant developed a serious substance abuse problem after he arrived in Los Angeles in late adolescence, a symptom common in victims of sexual molestation. But once again, Dr. Kaser-Boyd did not explain the source of information about appellant's substance abuse problem. Dr. Kaser-Boyd also cited independent jail records which documented appellant's frequent nightmares, recurring thoughts about childhood sexual abuse, and feelings of depression and worthlessness.

On this record, we find no abuse of the trial court's discretion in requiring appellant to testify to a factual foundation for Dr. Kaser-Boyd's opinion that he suffered from PTSD. As in *Yuksel*, the trial court acted within its discretion in concluding that admission of appellant's statements through the expert's testimony would allow the jury to consider those statements for the truth of the matter asserted. (*Yuksel*, *supra*, 207 Cal.App.4th at p. 857.)

10

## II

Appellant argues that while cross-examining him, the prosecutor committed numerous incidents of prejudicial misconduct which undermined his state and federal due process rights to a fair trial. He points out that the trial court overruled objections by his trial counsel on pages 3171 and 3333 of the reporter's transcript.

### A. *Misconduct*

### 1. *Prostitution*

Appellant argues it was improper for the prosecutor to ask appellant if he had told detectives that he had prostituted himself for money. He cites a series of questions during his cross-examination in which appellant denied asking Bradley for money in exchange for sex. Appellant denied prostituting himself for money. The court sustained a defense objection to a question asking whether appellant prostituted himself for people who "appreciate" it. The prosecutor then asked: "Mr. Fructuoso, you told Detective Frettlhor that you don't like to prostitute yourself for money; isn't that true?" There was no objection, and appellant answered "Yes." The court overruled an objection when the prosecutor next asked whether appellant told Detective Frettlhor that he did prostitute himself for money, but only to people "who appreciate" it. When the interpreter said the question had not been interpreted, the prosecutor asked whether appellant told Detective Frettlhor that he did prostitute himself. An objection was overruled and appellant denied saying both that, and that he only prostituted himself for people who appreciate it. Appellant also denied committing prostitution with another man.

At sidebar, defense counsel argued that the transcript of appellant's interview with the detectives clearly showed that appellant denied engaging in prostitution for money. The prosecutor disagreed, quoting the transcript in which appellant said he did not prostitute himself, and "I just like to do it with persons I like." The prosecutor told the court he planned to play this recording for the jury. Defense counsel continued to argue that appellant consistently denied prostituting himself for money during the interview. The court read the transcript and ruled that the prosecutor had a good faith basis to

11

inquire into this area, and overruled the objection. The court advised defense counsel that she could examine appellant about the conversation on redirect.

Later, outside the presence of the jury, the prosecutor asked to make a record regarding his good faith basis for asking appellant whether he told the detective he had prostituted himself. He read the following portion of the transcript of the police interview into the record regarding appellant's relationship with another man: "Question, 'bisexual? Okay, now your relationship, your relationship with Danny, was that just for money, or did you do it sometimes for—because you wanted to?' 'Well, that happened at a time, well, that he had me, and I didn't think there was a reason to say or to reject him or—but I did like him.' [¶] 'You liked him?' [¶] 'Yes. I did like—yes, and I didn't like prostituting myself for money, no.' [¶] 'But did you do it?' [¶] 'Yes.'" The prosecutor said this was the basis for his good faith belief that appellant told the detective he had prostituted himself for money and with Danny. The prosecutor read the next portion of the interview transcript in which the detective asked appellant how long he had been prostituting himself. Appellant once again denied that, and said "'I just like to do it with a person I like.'"

Defense counsel argued that "it" in the last quoted sentence could refer to either prostitution or sex. She contended it was not a reference to prostitution because appellant corrected the detective and said "'No, I didn't prostitute myself.'" The court said that it had allowed the question and asked the prosecutor whether he planned further examination of appellant on that issue. The prosecutor said he did not, that he just wanted to demonstrate the basis for his good faith belief in the propriety of that line of questioning. Ultimately, the prosecutor chose not to play the interview for the jury.

2. *Concealed Knife*

After a recess, the court said: "I have a note from one of the jurors who has a different view concerning the interpretation, and I'm going to read it in the record. Then counsel may want to inquire again to see if you can clarify the point, whether Mr. Haidar [the prosecutor] said something to the effect of, quote "'In fact, that's when you pulled the knife out of your pants?' Or, quote, 'Translator never mentioned anything about his

12

pants or the knife being concealed.'" The court invited counsel to consider the note and decide whether they wanted to reexamine appellant about these questions. Redirect examination of appellant resumed, and he was asked whether he had a weapon concealed in his pants on January 2, 2010 when he went to Bradley's apartment. Appellant said he did not.

## 3. Observation of Animal Slaughtering

In cross-examination of appellant, the prosecutor asked him about his work in produce at a market in Oaxaca before he came to the United States. The prosecutor asked whether animals were slaughtered at that market. Appellant said no, small animals were sold. When the prosecutor asked whether they were sold alive, the trial court sustained an objection that there was no good faith basis for those questions. Objections were sustained to questions as to whether appellant had seen animals being slaughtered while in Mexico.

At a sidebar conference, the prosecutor argued that whether appellant had observed animals being slaughtered by slitting their throats was "relevant to his knowledge and ability to [do] what he did to Bennett Bradley which is slitting his throat." Defense counsel objected that there was no evidence that appellant slaughtered animals, and that the question was argumentative. She complained that the prosecutor had repeatedly asked questions containing a fact not in the record which could not be proven, which was prejudicial to appellant. She contended the prosecutor had no good faith basis to believe that animals were slaughtered in the market where appellant worked in Oaxaca. The court responded: "That's not an unusual position to take." Defense counsel argued that this line of questioning was prejudicial misconduct because the prosecutor was, in effect, testifying to facts not in evidence.

In arguing that the question about animal slaughtering was part of a pattern of misconduct by the prosecutor, defense counsel cited the note from a juror about the interpretation of testimony regarding whether appellant concealed a knife in his pants. Defense counsel argued that this note demonstrated that one of the jurors had observed that the prosecutor was testifying to facts in the context of his questions to appellant.

13

The prosecutor responded: "It's common knowledge. I've been to Mexico. These small towns, they slaughter animals. It's not anything unusual." Defense counsel demanded an offer of proof from the prosecutor as to the basis for a belief that appellant has a specific knowledge about how to slaughter animals.

The court ruled that the entire line of questioning was not irrelevant and that the prosecutor had not acted improperly. It observed: "I just think that it's common sense that if you cut someone's throat, they are either going to die or be severely injured for a long time. I think it's a waste of time. That's why I sustained the objections." The prosecutor was admonished to move on to another line of questioning and did so.

B. *Analysis*

"'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." [Citations.]' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 960 (*Clark*).) In order to preserve a claim of prosecutorial misconduct, the defendant must make a timely and specific objection, and also must ask the trial court to admonish the jury to disregard the impropriety. (*Ibid.*) "The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm. [Citations.]" (*Ibid.*)

Respondent argues that appellant forfeited his claims of prosecutorial misconduct because his counsel either failed either to object or to request that the jury be admonished. As to the issue regarding prostitution activities, although defense counsel objected on the grounds that the questions had been asked and answered and were argumentative, respondent argues no objection was made on the grounds of misconduct. It also argues defense counsel did not ask the court to admonish the jury to disregard the

14

impropriety, even when she questioned whether the prosecutor had a good faith basis to ask appellant about his statements to the detective. In response to the prosecutor's questions about whether appellant hid the knife in his pants when he went to Bradley's house, the only objection raised by defense counsel was that the question had been asked and answered. Respondent concedes that defense counsel objected to the impropriety of the animal slaughter line of questions by the prosecutor, but argues she failed to request that the jury be admonished to disregard it.

We agree that defense counsel did not raise the correct objection to the concealed knife line of questioning. Defense counsel did object to the propriety of the prostitution and animal slaughter questions. More significantly, she did not request an admonishment as to any of the three lines of questioning at issue. Appellant claims there was no basis for an admonishment because his attorney's objections had been overruled.

It is established that defense counsel must state a specific objection *and* request the jury be admonished to disregard the impropriety in each instance of claimed prosecutorial misconduct. (*People v. Thomas* (2012) 54 Cal.4th 908, 938–939, citing *People v. Cook* (2006) 39 Cal.4th 566, 607 [objection at trial that a question posed to the witness was argumentative did not preserve a claim of prosecutorial misconduct by attempting to shift the burden of proof].) Appellant does not argue, nor has he demonstrated that "corrective actions, such as appropriately strong admonitions, would not have been able to cure any prejudicial effect on the jury had defendant requested them." (*People v. Fuiava* (2012) 53 Cal.4th 622, 680; see also *People v. Boyette* (2002) 29 Cal.4th 381, 447 [holding that claim of misconduct was not preserved where defense counsel failed to request the jury be admonished, where there was no indication such a request would be futile or that counsel's failure to so request was so prejudicial as to constitute ineffective assistance.].)

Alternatively, appellant argues the failure of his counsel to interpose a specific objection or request that the jury be admonished as to each of the three incidents of misconduct constitutes ineffective assistance of counsel. He claims this is "because a defense attorney would have no tactical reason to remain silent under an onslaught of

15

highly prejudicial prosecutorial misconduct. (U.S. Const. Amend. VI; Strickland v. Washington (1984) 466 U.S. 668, 687–688.)" The Supreme Court has repeatedly held that "the mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel. [Citation.]" (*People v. Boyette*, *supra*, 29 Cal.4th at p. 433.)

In *People v. Kaurish* (1990) 52 Cal.3d 648, the Supreme Court rejected a claim that defense counsel was ineffective by failing to object to claimed instances of prosecutorial misconduct. It concluded that "defense counsel could have reasonably concluded that such evidence was tangential to the case and that objections would serve only to accentuate defendant's negative qualities in the minds of the jurors. [Citation.]" (*Id*. at pp. 677–678.) "'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' [Citation.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1290.) In *People v. Huggins* (2006) 38 Cal.4th 175, 206, the Supreme Court reiterated: "Moreover, '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' [Citation.]" It suggested that one satisfactory explanation for a failure to object would be the desire of defense counsel to avoid drawing the jurors' attention to the prosecutor's comments. (*Ibid.*)

Even assuming that all of the misconduct claims are preserved for appeal, we find no basis for reversal. As to the prostitution line of questioning, we conclude the prosecutor demonstrated a good faith belief in the facts underlying these questions. "''It is improper for a prosecutor to ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist.'' [Citations.]" (*People v. Friend* (2009) 47 Cal.4th 1, 80.) The prosecutor's questions were properly based on the portion of the interview with the detective in which appellant said he prostituted himself for money, although he did not like it. Any ambiguity in this statement could have been addressed by defense counsel on redirect. It was relevant to appellant's defense that the murder occurred when Bradley attempted to rape him, as he had done when appellant was 16.

Similarly, since the knife with Bradley's blood was found in appellant's apartment, the prosecutor had a good faith basis to ask appellant whether he had the knife concealed in his clothing when he went to Bradley's apartment. We agree with respondent that the juror's note appeared to refer to problems the juror had with the interpretation rather than the prosecutor's conduct.

We find less support for the prosecutor's questions about appellant's observation of animal slaughter in Mexico while working at a market. But the trial court sustained defense objections that the prosecutor had no good faith factual basis for this line of questioning. After objections to two questions were sustained, a sidebar was held. Although the court found the prosecutor had not acted improperly, it found the questions were a waste of time and directed the prosecutor to move on to another topic. Defense counsel failed to ask the court to admonish the jury to disregard the questions. The jury was instructed that the questions by counsel are not evidence. It was told: "Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." On this record, we find no prejudicial misconduct under either the state or federal standards.

III

Appellant argues the trial court erred in allowing testimony, over defense objection, by Aimee Rogers, an analyst for Orchid Cellmark about DNA analyses she did not personally perform. He contends that the worksheets she relied on in reaching an opinion regarding DNA evidence were testimonial hearsay. Appellant contends that the admission of this testimony violated his confrontation rights under the Sixth Amendment.

*A. Procedural Background*

Rogers testified at a hearing under Evidence Code section 402 about the procedures at the Orchid Cellmark laboratory for extracting and analyzing DNA. She explained that automation specialists placed evidence samples into machines which then generated an electropherogram, known as a visual DNA printout. Worksheets of the technician's work and quality assurance tests were kept. Rogers testified that she

17

prepared a report (exhibit 45) based on her analysis of 350 pages of raw data generated by the machines from materials collected from Bradley, defendant, and various locations at the crime scene. She had not personally observed the creation of the data and the work of the technicians, although she reviewed all the worksheets and found no violations of protocols or errors.

Appellant argued that admission of this evidence violated his Sixth Amendment confrontation rights. The trial court concluded that the technicians who took part in the testing process, but who did not testify, were "not themselves reporting any objective facts." The court concluded that they were "submitting the samples to machines, which are generating information, which is now to be used by the expert." It allowed Rogers to testify to her analysis of the DNA.

Rogers then testified before the jury that Bradley's DNA was found on the knife recovered from appellant's apartment. Appellant's DNA was found on samples taken from the bathroom sink and soap dispenser in Bradley's apartment. The probability that the DNA found on the bathroom sink and soap dispenser belonged to anyone else but appellant in the southwest Hispanic population was one in 115.4 quadrillion. The probability of a random unrelated individual in the Black population having the same DNA profile as Bradley's as found on the sink, soap dispenser and knife was one in 438 trillion, one in 2.909 quadrillion in the Caucasian population, one in 10.25 quadrillion in the southeast Hispanic population, one in 34.31 quadrillion in the southwest Hispanic population, and one in 229.4 quadrillion in the Asian population.

B. *Legal Principles*

"The Sixth Amendment of the United States Constitution grants a criminal defendant the right to confront adverse witnesses." (*People v. Lopez* (2012) 55 Cal.4th 569, 573 (*Lopez*).) In *Crawford v Washington* (2004) 541 U.S. 36 (*Crawford*), "the court created a general rule that the prosecution may not rely on 'testimonial' out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination." (*Lopez*, *supra*, 55 Cal.4th at p. 576, citing *Crawford*, at p. 59.) The United States Supreme Court applied its *Crawford* holding in three cases

involving laboratory findings of nontestifying analysts: *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*); *Bullcoming v. New Mexico* (2011) 564 U.S. ___, 131 S.Ct. 2705 (*Bullcoming*), and *Williams v. Illinois* (2012) 567 U.S. ___, 132 S.Ct. 2221 (*Williams*).  Little agreement was reached by the justices in these cases, the first two of which were decided 5-4, although in each case Justice Thomas found a distinct reason for agreeing to the outcome of the majority in each.  In *Williams*, there was no majority opinion, but a four justice plurality.

The California Supreme Court addressed this quartet of cases in a trilogy of cases decided in 2012:  *Lopez, supra*, 55 Cal.4th 569, *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), and *People v. Rutterschmidt* (2012) 55 Cal.4th 650.  It carefully examined the various approaches adopted by the United States Supreme Court.  The court recognized that the United States Supreme Court had not agreed upon a definition of "testimonial" for confrontation clause purposes.  (*Lopez, supra*, 55 Cal.4th at p. 581.)  Based on its reading of the quartet of United States Supreme Court cases, the *Lopez* court identified two "critical components" required to find a statement testimonial:  1) the statement must have been made with some degree of formality or solemnity; and 2) "all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be."  (*Id*. at p. 582.)

The Supreme Court in *Lopez* reasoned that it need not consider the primary purpose of a nontestifying analyst's laboratory report on blood alcohol level, because it concluded that the critical portions of the report "were not made with the requisite degree of formality or solemnity to be considered testimonial."  (*Lopez, supra,* 55 Cal.4th at p. 582.)  In *Lopez*, a report written by a nontestifying analyst was admitted into evidence. A different criminologist testified at trial that he had reviewed the laboratory report and stated the conclusion of the analyst who prepared that report.  The testifying analyst went on to say that based on his own experience and review, he had reached the same conclusion.  (*Id*. at p. 574.)

19

Five pages of the laboratory report at issue in *Lopez* were comprised "entirely of data generated by a gas chromatography machine to measure calibrations, quality control, and the concentration of alcohol in a blood sample." (*Lopez, supra*, 55 Cal.4th at p. 583.) Although the nontestifying analyst's signature or initials appeared on each of these five pages, there was no statement, express or implied by him on any of them. (*Ibid.*) The Court concluded that machine generated printouts are not testimonial and do not implicate the Sixth Amendment right to confrontation. While it acknowledged that the United States Supreme Court has not yet addressed this question, the *Lopez* court agreed with federal appellate courts which had upheld the use of such printouts. (*Ibid.*) It reasoned: "Because, unlike a person, a machine cannot be cross-examined, here the prosecution's introduction into evidence of the machine-generated printouts . . . did not implicate the Sixth Amendment's right to confrontation." (*Ibid.*)

Factual distinctions between our case and *Lopez* bolster the conclusion that Rogers' testimony was not barred by the Sixth Amendment. Here, the only report received into evidence was prepared by Rogers herself, based on raw data generated by machines which she described as "robots" operated by nontestifying automation technologists. The 350 pages of raw data were not admitted into evidence. We conclude that under the reasoning of *Lopez, supra*, 55 Cal.4th at p. 583, Rogers' reliance on the machine-generated raw data did not violate the confrontation clause.

The first page of the chart on which the testifying analyst relied in *Lopez* contained handwritten notations by both the nontestifying analyst and a laboratory assistant, who also did not testify.[2] It was undisputed that the information that the defendant's blood sample contained .09 percent alcohol was admitted for its truth. (*Lopez, supra*, 55 Cal.4 at p. 584.) The *Lopez* majority concluded that the notations did not meet the

---

[2] The testifying analyst said a laboratory assistant filled in information regarding the booking number, Lab Number, sample sealed, subject's name and the name of the arresting officer for each of the nine samples recorded. Also included were the date and time the sample was collected and received at the laboratory. The chart showed the date the blood was analyzed and the results, apparently entered by the nontestifying analyst. (*Lopez* at pp. 583–584.)

20

requirements that they be made with formality or solemnity.  Neither the nontestifying analyst who performed the analysis nor the lab assistant signed, certified, or swore to the contents of page one of the report.  (*Id*. at p. 584.)  Justice Werdegar, in a concurring opinion signed by Chief Justice Cantil-Sakauye, Justice Baxter and Justice Chin, agreed that the logsheet notations were not made with sufficient formality or solemnity to be deemed testimonial.  (*Id*. at p. 585.)

Respondent argues, and we agree, that there is no evidence that the raw data on which Rogers relied was prepared with the requisite formality or solemnity.  Nor is there here evidence of a sworn certification, declaration, or other formality.  Under these circumstances, we conclude the trial court did not err in allowing Rogers to testify to her own opinions based on the raw data generated by other technicians using various machines.


IV

Appellant argues the trial court erred in admitting a statement he made to an officer transporting him for booking, five hours after he had been given and waived his rights under *Miranda v. Arizona*, *supra*, 384 U.S. 436, by a different officer.

A.  *Procedural Background*

Detective Frettlhor testified at an Evidence Code section 402 hearing he advised appellant, in Spanish, of his *Miranda* rights.  This was during an interview at the Olympic station on January 5, 2010 at 2:30 a.m.  Appellant said he understood his rights.  The interview ended at approximately 4:00 a.m.  At that point, Detective Matthew Gares arranged for Officer Dana Grant and her partner to transport appellant for booking.  He told Officer Grant that appellant had been *Mirandized*, interviewed, and was ready for booking.  While at the Twin Towers jail facility, appellant initiated a conversation with Officer Grant in English.  The conversation culminated in his statement that he had a knife in his possession when he went to Bradley's apartment on the day of the murder because he was a recycler.  Appellant argues this statement should not have been admitted.

21

The trial court found that appellant was properly advised of his *Miranda* rights and that he waived them. Defense counsel argued that appellant should have been readvised of his *Miranda* rights by Officer Grant because there was a change in interrogator, a change of location, and appellant was not reminded that he had been advised of his *Miranda* rights. She argued that appellant was not sophisticated in that he used a Spanish interpreter, did not grow up here, and had no formal education. He did not have an extensive criminal history involving prior contacts with the police and familiarity with *Miranda* warnings. She contended that Officer Grant was mistaken in believing that appellant understood everything she said to him in English. The prosecutor argued that only a few hours had passed between the time appellant was advised of his *Miranda* rights, and appellant initiated the conversation with Officer Grant by asking how long he would be in jail. The prosecutor observed that appellant had been arrested in 2007 on a narcotics charge and on one other occasion.

The trial court ruled that Officer Grant would be allowed to testify to appellant's statements because he had been properly advised of his rights and had waived his right to remain silent only a few hours before. Defense counsel then argued that appellant's question about how long he would be in jail should not be seen as allowing Officer Grant to start questioning him about the crime. The court said it would review the relevant authority. The parties do not advise us that the court changed its ruling thereafter, and Officer Grant testified about the statements.

Before the jury, Officer Grant testified that she was assigned to transport appellant to jail. While at the Twin Towers jail, appellant asked her in English how long he would be in jail. She said she did not know much about the case, but that it was a serious charge. She asked how long he had known "the other guy." Appellant said he met Bradley when he was 16, got drunk with him, and then had sex with him, which made him feel ashamed and dirty. They had lost touch until recently (appellant was then 25 years old) and started having sex again. She asked appellant how he had gotten the knife, and testified that appellant responded "he already had it with him because he was a recycler." This was the end of the conversation.

22

*B. Analysis*

"After a valid *Miranda* waiver, readvisement prior to continued custodial interrogation is unnecessary 'so long as a proper warning has been given, and "the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver." [Citations.]' (*People v. Smith* [(2007)] 40 Cal.4th [483,] 504.) The necessity for readvisement depends upon various circumstances, including the amount of time that has elapsed since the first waiver, changes in the identity of the interrogating officer and the location of the interrogation, any reminder of the prior advisement, the defendant's experience with the criminal justice system, and '[other] indicia that the defendant subjectively underst[ood] and waive[d] his rights.' (*Ibid.*; see *People v. Mickle* (1991) 54 Cal.3d 140, 171 [an interrogation conducted 36 hours after the first interview was reasonably contemporaneous].) . . ." (*People v. Williams* (2010) 49 Cal.4th 405, 434–435.) In *Williams*, the Supreme Court concluded that no readvisement was required because the second interrogation was reasonably contemporaneous with the first, where it was 40 hours later at the same location as the first and was conducted by one of the previous interrogators. (*Id.* at p. 435.) The court considered the fact that the defendant had experience with the criminal justice system (prior convictions for residential burglary and rape, and for attempted burglary) and "evinced no reluctance to be interviewed." (*Ibid.*)

In *People v. Mickle*, *supra*, 54 Cal.3d at pp. 170–171, the Supreme Court held that no readvisement was required where a fourth interview of the defendant occurred 36 hours after the defendant had twice received and waived his *Miranda* rights. (*Id.* at p. 171.) After his arrest, the defendant was hospitalized in a room locked from the outside, from which the Supreme Court concluded "[i]t was clear from the circumstances that defendant was still in official custody." (*Ibid.*) Based on two prior convictions for lewd conduct and willful cruelty to a child, the court found that the defendant was familiar with the criminal justice system and "could reasonably be expected to know that any statements made at this time might be used against him in the investigation and any subsequent trial." (*Ibid.*) The officers asked the defendant if he remembered them and

23

their prior conversations. (*Ibid;* see also *People v. Lewis* (2001) 26 Cal.4th 334, 386 [readmonishment not required for second interview conducted five hours after waiver of rights where location was unchanged, defendant had prior citations and warnings from police, and defendant was mentally alert and spoke freely during ongoing and cooperative process]; *People v. Smith*, *supra*, 40 Cal.4th at pp. 504–505 [no readvisement required for second interview 12 hours after original advisement where defendant remained in custody, location was unchanged, and officers were the same, defendant was asked if he wanted to hear warnings again].)

Here, appellant acknowledges that the five hours that elapsed between the time he was advised of his *Miranda* rights by Detective Frettlhor and his admission about the knife to Officer Grant is shorter than the time frames found sufficiently contemporaneous in a number of cases which did not require readvisement. But he argues that his second statement was made in a different location to a different officer. He also contends that he was unsophisticated, citing his limited English skills, lack of education, and childhood in Mexico. He discounts his two prior arrests for narcotics-related offenses. He asserts: "It would be reasonable for appellant to believe the questioning by Officer Grant was not something that would be used against him since it was done in a police car, in English, by a different interrogator, and without any reference to Miranda."

Officer Grant testified at trial that appellant initiated the conversation with her "[w]hile at Twin Towers" when she was "next to the defendant." Appellant had been arrested and was waiting for booking in a jail facility, accompanied by a police officer. He had two prior arrests from which we can reasonably assume he was familiar with criminal procedures, including *Miranda* warnings. Only five hours before, he had been given his rights and waived them. Significantly, he initiated the conversation with Officer Grant. Under the totality of these circumstances, we find no error in admission of his statement to Officer Grant about bringing a knife to the crime scene.

V

Appellant argues that the trial court's response to a jury question about the difference between first and second degree murder was inadequate, leaving the jury confused and unable to differentiate between the two crimes. He was convicted of second degree murder.

The jury was given CALCRIM Nos. 520 and 521. As given, CALCRIM No. 520 was titled: "**First or Second Degree Murder With Malice Aforethought (Pen. Code, § 187)**.[3]

---

[3] As given, CALCRIM No. 520 read: "The defendant is charged with murder. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] 2. When the defendant acted, he had a state of mind called malice aforethought; [¶] AND [¶] 3. He killed without lawful excuse or justification. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with *express malice* if he unlawfully intended to kill. [¶] The defendant acted with *implied malice* if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree."

As given, CALCRIM No. 521 was titled: "**First Degree Murder (Pen. Code, § 189)"** It read: The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] The requirements for second degree murder based

25

During deliberations, the jury sent the following note to the court: "'We need a clear definition, please, between first and second degree murder.'" The court informed counsel that it had asked the jury to be more specific. The jury responded: "'There is some confusion due to instructions, its wording, in particular, page 9 re: 521 mentioned explanation in 520, but we need some clarification.'" The court concluded that this question referred to the following language in CALCRIM number 521: "'Requirements for second degree murder, based on expressed or implied malice, are explained in CALCRIM number 520, first or second degree murder with malice aforethought.'" The court observed: "[I]t does stand out because there's nothing in 520 that makes mention of second degree murder or expressed or implied malice."

After further colloquy, it was agreed the jury would be brought into the courtroom. The court told the jury there were two options, to reread the particular instructions, or to have the foreperson ask for further clarification. The foreperson said: "We've read them a couple times already, the instructions. 521 states that the definition of second degree is found in 520." The court interjected that this was correct. The foreperson continued: "But 520, the title is first and second degree." The court suggested that the jury ignore the titles of the instructions and asked if this would help deliberations. The foreperson answered: "Right." The court explained that titles of instructions are used only for quick reference. He inquired whether the foreperson wanted to go back into the jury room to ask the fellow jurors whether further clarification was needed. No additional questions or notes were sent by the jury.

The trial court judge told the jury that he would be absent the next day, but if it wanted to continue deliberations, it could do so with another judge presiding. Although it is not reflected in the record, apparently this was the choice of the jurors because they

on express or implied malice are explained in CALCRIM No. 520, *First or Second Degree Murder With Malice Aforethought*. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

resumed deliberations the next day with a different trial court judge presiding. At the outset of the day, outside the presence of the jury, that judge stated his understanding that there was an issue about the jury and asked counsel for background. Defense counsel recounted the foreperson's concern about the title of CALCRIM No. 520, but said it was not clear exactly what the jury was unclear about. She said that overnight she had become uncertain as to whether the trial judge's suggestion to ignore the titles of the instructions cured the jury's confusion. The substitute judge indicated that the titles for instructions are not part of the instruction to be considered by the jury. The prosecutor agreed. The court asked whether the jury had sent out any questions since the direction to ignore the titles the previous day. The prosecutor said that it had not. The court said it wanted to be certain that there was no pending jury question. It indicated: "If there's no pending jury question, it seems to be prudent just to allow the jury to continue to deliberate based upon whatever answer or response Judge Landin gave, and if they have a need for further clarification, we can always address it if it comes to pass."

Defense counsel asked the court to make it clear that CALCRIM No. 520 does describe first and second degree murder and to remind the jury that the third element, whether it was a justifiable or excusable homicide, was addressed in other instructions the jury already had received. The court expressed reluctance to do so since it had not heard the previous discussion with the jurors or the colloquy between Judge Landin and counsel. It was not inclined to "bring the jury out and tell them something that I don't know needs to be told." The prosecutor concurred. The court made it clear that it would be willing to respond to any further question from the jury after consultation with counsel. Later that day, following a recess, the jury reached a guilty verdict on second degree murder.

Appellant argues that in light of the jury's confusion, "there is no reliable way to know if the jury understood that if appellant acted in self-defense to avoid being raped, or if he acted in imperfect self-defense or heat of passion, he was not guilty of second degree murder." He also suggests this was a compromise verdict because it was reached the day before Thanksgiving.

27

The jury was understandably confused about the definition of second degree murder as treated in CALCRIM Nos. 520 and 521, but appellant is not raising a separate issue of instructional error. Instead, his argument is that the trial court did not adequately respond to the jury's questions. These instructions required the jury to determine whether appellant acted with malice aforethought, and if it found he did, whether the killing was premeditated, willful, or deliberate in order to eliminate first degree murder, and then consider second degree murder, an analysis made more difficult by these instructions. But the instructions made it clear that if the jury found that appellant acted with malice aforethought, he was guilty of either first or second degree murder rather than voluntary manslaughter or was not guilty because the killing was a justified homicide on a self-defense theory. Since the jury did reject the first degree murder theory, we find no prejudicial error in the trial court's response to the jury's questions. In addition, the court gave the jury ample opportunity to express any continuing confusion about these instructions and it did not. There is no support for appellant's speculative argument regarding prejudice. The jury had no questions about the instructions on voluntary manslaughter, self-defense, or imperfect self-defense.

A claim that the trial court failed to adequately answer a jury's question under section 1138 is subject to the standard of *People v. Watson*, *supra*, 46 Cal.2d at p. 836: whether the error "resulted in a reasonable probability of a less favorable outcome." (*People v. Roberts* (1992) 2 Cal.4th 271, 325–326.) Since the jury had to conclude that appellant acted with malice in order to convict him of second degree murder, there is no reasonable probability of a better outcome.

VI

Appellant challenges the sufficiency of the evidence to support the second degree murder conviction, arguing that, instead, the evidence proved only voluntary manslaughter. He contends the conviction violates his state and federal constitutional rights to proof of every element of the offense beyond a reasonable doubt.

28

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "'Under principles of federal due process, review for sufficiency of the evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317–320.)' [Citation.]" (*People v. Watkins* (2012) 55 Cal.4th 999, 1019–1020.)

Appellant argues the evidence establishes that he killed Bradley in the heat of passion, which negates malice, and therefore he was guilty only of voluntary manslaughter rather than second degree murder. Respondent argues the evidence is consistent with second degree murder committed in hopes of material gain.

"'Murder is the unlawful killing of a human being . . . with malice aforethought.' (Pen. Code, § 187, subd. (a).) When an unlawful killing occurs 'upon a sudden quarrel or heat of passion' (Pen. Code, § 192, subd. (a)) the killer lacks malice, and the crime is voluntary manslaughter, a lesser offense necessarily included within the crime of murder. [Citation.]" (*People v. Dungo*, *supra*, 55 Cal.4th at p. 615, fn. 4.) The heat of passion form of voluntary manslaughter is distinguished from murder by provocation. (*People v. Souza* (2012) 54 Cal.4th 90, 116.) "'The "'heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances. . . .'" [Citation.]' (*Ibid.*)" (*Ibid.*)

"Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of

average disposition to act rashly or without due deliberation and reflection. [Citation.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation. [Citation.]'" (*Ibid.*) The jury was instructed that provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter (CALCRIM No. 522). It was also instructed on voluntary manslaughter— heat of passion (CALCRIM No. 570).

There was sufficient evidence to support an instruction on voluntary manslaughter committed in the heat of passion and the jury was instructed on that theory. But it rejected it. There was evidence from appellant's statement to Officer Grant that he brought the knife used in the killing to Bradley's apartment. Respondent also cites the telephone conversation overheard by Bradley's neighbor, in which Bradley said that he would not pay for sex. The bedroom had been ransacked and cash and other valuables were missing from the apartment. The jury could reasonably conclude that the murder was committed for financial motives rather than in the heat of passion. "'"'[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]'" [Citation.]" (*People v. Clark*, *supra*, 52 Cal.4th at p. 945.) The conviction of second degree murder is supported by substantial evidence.

## DISPOSITION

The judgment of conviction is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

MANELLA, J.                                    SUZUKAWA, J.

30